IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

JAMES S., and A.S.,

    Plaintiffs,

vs.

MEDCOST BENEFIT SERVICES LLC, CAROLINA BEHAVIORAL HEALTH ALLIANCE, the CHARLOTTE MECKLENBERG HOSPITAL AUTHORITY d/b/a ATRIUM HEALTH, and the LIVEWELL HEALTH PLAN

    Defendants.

Case No. 3:24-cv-00968

## COMPLAINT

Plaintiffs James S. ("James") and A.S., through their undersigned counsel, complain and allege against Defendants Medcost Benefit Services LLC., ("Medcost"), Carolina Behavioral Health Alliance ("CBHA"), the Charlotte Mecklenberg Hospital Authority d/b/a Atrium Health ("the Plan Administrator"), and the LiveWELL [sic] Health Plan ("the Plan") as follows:

### PARTIES, JURISDICTION AND VENUE

1. James and A.S. are natural persons residing in Mecklenberg County, North Carolina. James is A.S.'s father.

2. Medcost provided third party claims administration services and acted as a fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. CBHA is also a third party administrator contracted by the Plan specifically to administer mental health and substance use disorders benefits.

1

4. Both Medcost and CBHA were involved in the processing and denial of claims and appeals relevant to this case.

5. At all relevant times Medcost and CBHA acted as agents for the Plan and the Plan Administrator.

6. The Plan Administrator is the designated administrator for the Plan.

7. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). James was a participant in the Plan and A.S. was a beneficiary of the Plan at all relevant times. James and A.S. continue to be participants and beneficiaries of the Plan.

8. A.S. received medical care and treatment at Dragonfly Transitions ("Dragonfly") from February 22, 2022, to March 21, 2023. At the time A.S.'s treatment took place, Dragonfly was a licensed transitional living facility located in Klamath County Oregon, which provided sub-acute treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

9. Medcost and CBHA denied claims for payment of A.S.'s medical expenses in connection with his[1] treatment at Dragonfly.

10. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

11. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because the Plaintiffs reside in North Carolina and defendants have a significant business presence there.

---

[1] At times A.S. used female pronouns and/or a different name. This is often reflected in the medical records and other pertinent documentation.

12. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Administrator and its agents, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

**Dragonfly**

13. A.S. was admitted to Dragonfly on February 22, 2022, to address issues which included gender dysphoria, complications from in-utero drug and alcohol exposure, ADHD, theft, depression, anxiety, suicidal ideation, self-harming, substance abuse, and borderline personality disorder.

14. In a series of Explanation of Benefits statements Medcost denied payment for these services under the following procedural codes:

    BK1: PROCEDURE/SERVICE EXCLUDED, SEE SPD PLAN EXCLUSION.
    AP1: LACK OF PRECERT OR EXCEEDING AUTHORIZED DAYS.

15. On February 1, 2023, James submitted an appeal of the denial of payment for A.S.'s treatment. James wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse

3

determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

16. He asked that the reviewer be knowledgeable about generally accepted standards and clinical best practices for transitional living programs in the state of Oregon where Dragonfly was located, as well as trained in the details of MHPAEA to address his concerns regarding a violation of the statute.

17. He reminded Medcost that it had a fiduciary duty to act in his best interest. He asked it to respond to his appeal using specific references to the materials it relied upon. He also asked for physical copies of any documentation it utilized in the review process, including any case notes or reports.

18. James wrote that transitional living services were not listed in his benefits booklet as a service which required precertification, and even in the event precertification was not obtained, no specific penalty for failure to obtain precertification was listed.

19. He noted that the explanation of benefits statements he had received erroneously classified the treatment at Dragonfly as hospital services. He stated that A.S. did not receive hospitalization or residential care at Dragonfly but that Dragonfly was a licensed and accredited transitional living facility which followed national best practices.

20. He wrote that A.S.'s treatment had been properly billed using the 1003 code for transitional services. He stated that he was also unable to find any exclusion for transitional care in his benefits booklet. He noted that there were restrictions for services such as convalescent homes, spas, sanitariums, custodial care, or wilderness camps, but none of these restrictions were applicable to A.S.'s care.

4

Case 3:24-cv-00968-KDB-SCR     Document 1     Filed 11/01/24     Page 4 of 19

21. James wrote that A.S. had been admitted to Dragonfly on the strong recommendation of his treatment team. He argued that his treatment was medically necessary and that it was a covered service under the terms of the Plan.

22. James expressed concern that the denial of payment for A.S.'s treatment was a violation of MHPAEA. He argued that MHPAEA compelled insurers to ensure that benefits for behavioral health conditions were offered at parity with coverage for analogous medical or surgical services. He identified skilled nursing, subacute rehabilitation, and inpatient hospice care as some of the medical or surgical analogues to the mental health treatment A.S. received.

23. James voiced his concern that Medcost was imposing a treatment limitation based on facility type to A.S.'s treatment, as Medcost was denying payment as if the services were excluded despite no actual relevant exclusion being present in his benefits booklet. He asked Medcost to conduct a MHPAEA compliance analysis on the Plan to ensure it was compliant with the statute. He asked to be provided with physical copies of the results of this analysis.

24. In addition James asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

25. In a letter dated March 3, 2023, attributed to CBHA reviewer Dr. James Kimball, the denial of A.S.'s treatment was upheld. The letter gave the following justification for the denial:

> I have reviewed the documentation provided as well as considered information from the facility concerning their services. Notes appear to relate to therapeutic interactions, help with vocational needs or other supports to daily living that, while helpful, are not behavioral health therapy. It is unclear from the information if there is round the clock, on-site nursing available or whether this person sees a physician once per week while at the facility. While there appears to be some services provided to treat a behavioral health diagnosis, the treatment does not appear to be consistent with a residential care facility. The care appears to be associated with supportive living and, therefore, custodial in nature.
>
> The clinical review criteria used in making this determination is available upon your written request if applicable.

26. On June 26, 2023, James asked for the denial of payment to be evaluated by an external review agency. James argued that Medcost and CBHA had failed to abide by their ERISA obligations during the review process.

27. He wrote that while the initial denial had been based on a lack of precertification and a supposed plan exclusion, CBHA had shifted its reasoning to a denial based on a custodial care designation and that this prejudiced James' ability to successfully appeal the denial.

28. He wrote that the denial letter continued to erroneously refer to Dragonfly as a residential treatment facility. He asked how he could have received a fair review if A.S.'s care had not even been evaluated using criteria for the correct level of care.

29. He stated that CBHA had failed to meaningfully respond to any of the arguments he raised, including his contention that the Plan was not being administered in accordance with MHPAEA. He expressed concern that the reviewer was not appropriately qualified and also pointed out that the denial letter had not made any references to the clinical evidence and documentation he included with the appeal.

30. James argued that A.S.'s treatment did not fit the definition of custodial care in his benefits booklet. This definition stated:

> Custodial Care is care (including room and board needed to provide that care) that is given principally for personal hygiene or for assistance in daily activities and can, according to generally accepted medical standards, be performed by persons who have no medical training. Examples of Custodial Care are help in walking and getting out of bed; assistance in bathing, dressing, feeding; or supervision over medication that could normally be self-administered.

31. James wrote that A.S.'s treatment was designed to address the significant functional impairments he was experiencing and was intended to reduce his risk of relapse and regression.

32. James included a letter dated April 14, 2023, from Elias Ayala, MSW, A.S.'s primary therapist at Dragonfly. The letter stated in part:

> Firstly, this program is not a "Custodial Care" program or facility, so it is hard to imagine that you believe that [A.S.] is here just for bathing, dressing, feeding and the like. He is an active participant in this program and has made significant progress. His therapy and care is overseen by skilled personnel and is clearly not to oversee his activities of daily living.
>
> The Medical College of Medical Quality draws a clear distinction between the definitions of "skilled" and "custodial" care as follows:
>
> "Skilled care is the provision of services and supplies that can be given only by or under the supervision of skilled or licensed medical personnel. Skilled care is medically necessary when provided to improve or to maintain the quality of health of patients or to slow the deterioration of a patient's condition. Skilled care is prescribed for settings that have the capability to deliver such services safely and effectively. Custodial care is the provision of services and supplies for activities of daily living that can be provided safely and reasonably by individuals who are neither skilled nor licensed medical personnel."
>
> Any denial of this nature simply does not fit the care that is being provided nor the mental health needs of [A.S.]. Full re-consideration should be given to coverage of this treatment program.

33. James argued that A.S.'s treatment was not consistent with his plan's definition of custodial care, or the definition of custodial care used by other insurers. He contended that A.S. did not require assistance with daily activities like bathing or dressing and that he was receiving treatment from licensed and skilled clinicians. He argued that A.S.'s treatment was medically necessary and included a copy of his medical records with the appeal.

34. In a letter dated August 1, 2023, a reviewer from the Medical Review Institute of America, upheld the denial of benefits for A.S.'s treatment. The reviewer wrote in response to the question of whether the dates of service in question were covered by the Plan:

> No, the dates of service in question (02/10/23-03/21/23) are not covered by the health plan.
>
> On the basis of the clinical information provided, the patient did not meet the criteria for residential setting. [sic] There is no medical diagnosis which currently requires treatment in this setting. The symptoms of depression and anxiety can be safely treated at a lower level of care. The patient is not a threat to himself or others. There are no symptoms or complaints that need 24 hours care. No issues with his recovery environment are reported that would need this level of care. No active suicide ideation or homicidal ideations. No delusions, hallucinations, or aggressive behavior. The patient was not planning to hurt himself or anyone else. He was not agitated or aggressive. No health problems that needed 24 hour care are noted. No medication side effects were reported to the recently initiated medications to address mood, no aggression or significant mood instability reported, sleep and activity of daily living within normal limits. It seems the stay was more of a custodial care.

35. In addition, in a letter dated August 10, 2023, the Medical Review Institute of America again upheld the denial of payment for A.S.'s treatment. The reviewer gave the following reason for upholding the denial:

> The Atrium Health LiveWELL Summary Plan Description states in pertinent part on page 107: "DEFINED TERMS

Medically Necessary care and treatment is recommended or approved by a Physician [MET]; is consistent with the patient's condition or accepted standards of good medical practice [NOT MET]; is medically proven to be effective treatment of the condition [NOT MET]; is not performed mainly for the convenience of the patient or provider of medical services [MET]; is not conducted for research purposes [MET]; and is the most appropriate level of services which can be safely provided to the patient. [NOT MET]

All of these criteria must be met; merely because a Physician recommends or approves certain care does not mean that it is Medically Necessary.

The Plan Administrator has the discretionary authority to decide whether care or treatment is Medically Necessary."

There is a lack of persistent symptom severity or impairment of functioning that would support the use of 24-hour-a-day monitoring and support in a supported living situation. The submitted documentation from the provider, as well as the appeal information, supports the presence of chronic difficulties largely related to autism spectrum disorder with co-occurring impulsivity, poor judgment, and impacts on daily activities. However, the submitted clinical information does not support a persistent level of impairment or severity of symptoms that the patient would require a level of supervision that is greater than could be obtained in the community. In this case, the evidence indicates that the patient could have been treated safely and effectively through the use of ongoing outpatient services supplemented by care management and social skills group training. The patient's chronic difficulties do not indicate a degree of impairment that supports the use of a protected, supervised living situation. According to the principle of medical necessity as supported by standard criteria, such as InterQual, there is no medical necessity for the requested coverage.

The requested transitional supervised living is not medically necessary for this patient based on the plan definition and current medical literature.

Based on the above, the previous determination is upheld.

36. On October 12, 2023, James sent a request to the Plan Administrator asking for documentation which he was entitled to receive. In particular, he asked to be provided with:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my child, [A.S.] at Dragonfly Transitions, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [A.S.]'s claim;

- A complete copy of both the medical necessity criteria utilized by Atrium Health in determining that [A.S.]'s treatment was not medically necessary and that treatment for him at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Copies of documents identifying the self-compliance analysis the Plan and Atrium Health have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
- Complete copies of any and all internal records compiled by Atrium Health and Medcost Benefit Services LLC in connection with [A.S.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [A.S.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and Atrium Health; and
- Copies of any and all documents outlining the level of accreditation required for residential treatment programs;
- Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and
- Copies of documents identifying the process, strategies, evidentiary standards, or other factors the Plan used to determine that the treatment at Dragonfly Transitions was experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to determine whether treatment at sub-acute inpatient programs for medical or surgical treatment is experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

37. James received no response to this request.

38. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

39. The denial of benefits for A.S.'s treatment was a breach of contract and caused James to incur medical expenses that should have been paid by the Plan in an amount totaling over $140,000.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B) Against the Plan and its Third Party Administrators)**

40. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Medcost and CBHA, acting as agents of the Plan, to discharge their duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

41. Medcost, CBHA, and the Plan failed to provide coverage for A.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

42. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

43. The denial letters referenced above do little to elucidate whether the reviewers conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. The reviewers failed to substantively respond to the issues presented in James's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

44. For instance, in spite of James's repeated assertions that A.S. was not receiving residential or hospital care at Dragonfly, the reviewers continued to refer to and evaluate the treatment as such.

45. The reviewers made other assertions such as the declaration that the stay seemed to be "more of a custodial care" without addressing James's contention that A.S.'s treatment did not meet the definition of custodial services outlined in his benefits booklet.

46. Medcost, CBHA, and the agents of the Plan breached their fiduciary duties to A.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.S.'s claims.

47. The actions of Medcost, CBHA, and the Plan in failing to provide coverage for A.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity and facility eligibility criteria.

48. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

//

//

//

//

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3)
Against the Plan and its Third Party Administrators)**

49. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Medcost and CBHA's fiduciary duties.

50. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

51. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

52. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

53. The medical necessity and facility eligibility criteria used by Medcost and CBHA for the intermediate level mental health treatment benefits at issue in this case are more stringent

or restrictive than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

54. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

55. When Medcost, CBHA, and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

56. Medcost, CBHA, and the Plan evaluated A.S.'s mental health claims using criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

57. The denial letters reveal that the reviewers consistently denied payment while applying standards for a higher level of care. The letters refer to hospitalization and residential services throughout, despite A.S. not receiving treatment at this level during the timeframe at issue.

58. Concurrent with this elevated standard, the reviewers also referenced factors such as A.S. not being homicidal or suicidal and "not a threat to himself or others" as justifications to deny A.S.'s transitional care.

59. The denials also referenced (though not consistently), a plan exclusion as the basis for the denial, despite James pointing out that no such exclusion exists.

60. On information and belief, Defendants do not deny analogous medical or surgical benefits in this manner.

61. Plaintiffs requested documentation to allege a MHPAEA violation with more specificity but have yet to receive it.

62. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan, CBHA, and Medcost, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

63. Medcost, CBHA, and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Medcost, CBHA, and the Plan were not in compliance with MHPAEA.

64. In fact, despite James's request that Medcost, CBHA, and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Medcost CBHA, and the Plan have not provided James with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Medcost, CBHA, and the Plan have not provided James with any information about the results of this analysis.

65. The violations of MHPAEA by Medcost and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

//

//

# THIRD CAUSE OF ACTION

### (Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c)
### Against the Plan Administrator)

66. Medcost and CBHA acting as agents for the Plan Administrator, are obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan, CBHA, and Medcost, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

67. In spite of James's requests during the appeal process for Defendants to produce the documents under which the Plan was operated, Defendants failed to produce to the Plaintiffs the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan, CBHA, and Medcost, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

68. After Defendants failed to provide these materials, James sent one final letter dated October 12, 2023, to the Plan Administrator and its agents again requesting the documents which he was statutorily entitled to receive upon request. Defendants have yet to comply with this, or any other of James's request for documents.

69. The failure of the Plan Administrator and its agents, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of James's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties against the Plan

Administrator up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

70. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for A.S.'s medically necessary treatment at Dragonfly under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. For an award of statutory penalties of up to $110 a day against the Plan Administrator after the first 30 days for each instance of the Plan Administrator and its agents' failure or refusal to fulfill their duties, to provide the Plaintiffs with the documents they had requested.

4. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 31st day of October, 2024.

/s/ Brian S. King
Brian S. King
UT State Bar No. 4610
brian@brianking.com
**BRIAN S. KING. P.C.**
420 E. South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936

*Attorney for Plaintiffs*

Residence of Plaintiffs:

Mecklenburg County, North Carolina